IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| American Contractors Indemnity Company, | ) ) ) |
| Plaintiff, | ) Civil Action No. 7:09-2145-TMC-KFM ) **REPORT OF MAGISTRATE JUDGE** ) |
| vs. | ) ) |
| Carolina Realty and Development Company, Inc. | ) ) ) |
| Defendants. | ) ) |

This matter is before the court on the plaintiff's motion for summary judgment (doc. 135), the defendants' motion to enforce settlement agreement or, alternatively, for summary judgment (doc. 131), and the plaintiff's motion to designate an expert witness on the reasonableness of attorney's fees (doc. 165). In this indemnity action, the plaintiff is represented by counsel and all defendants with the exception of defendants John Baehr and Janis Baehr[1] are represented by counsel. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(e) DSC, all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.

## FACTS PRESENTED

Plaintiff American Contractors is a commercial surety in the business of issuing payment and performance bonds naming certain general contractors or subcontractors as principal and generally assuring the named obligee for a bond that the named principal will complete the performance required by its contract with the obligee for a certain construction project (pl. m.s.j., ex. 1, Frank Lanak aff. ¶ 3). In 2006, the

---

[1]Ms. Baehr has not appeared in the case.

defendants made an application to the plaintiff for certain bonds to be issued naming defendant Carolina Realty as principal and generally securing Carolina Realty's performance for certain construction subcontract work.

As part of its application, on or about July 6, 2006, Carolina Realty as corporate indemnitor and John Paul Baehr, Kimberly Baehr, William Lamar Baehr, Duffy Baehr, John Baehr, and Janis Baehr, each as individual indemnitors (hereinafter collectively referred to as the "Indemnitors"), executed and delivered to the plaintiff a General Agreement of Indemnity (Lanak aff., ex. C, indemnity agreement). Pursuant to the indemnity agreement, the Indemnitors agreed to:

> indemnify and hold the Surety harmless from and against any and all demands, liabilities, losses, costs, damages, attorneys' fees and expenses of whatever kind or nature together with interest thereon at the maximum rate allowed by law, which arise by reason of, or in consequences of, the execution by the Surety of any Bond on behalf of the Principal and whether or not the Surety shall have paid any sums in partial or complete payment thereof, including but not limited to: (2.1) sums paid including interest thereon at the maximum rate allowed by law, or liabilities incurred in the settlement or the adjustment of any and all claims, demands, damages, costs, losses, suites, proceedings, or judgments; (2.2) Expenses paid or incurred in connection with claims, suits, or judgments under such Bonds; (2.3) Expenses paid or incurred in enforcing the terms of this Agreement; (2.4) Expenses paid or incurred in procuring or attempting to procure release from liability under its Bond by Surety; (2.5) Expenses incurred in recovering or attempting to recover losses or expenses paid or incurred; (2.6) Attorney's fees and all legal expenses related to any items herein, including in-house attorney's fees, costs and expenses; investigation, accounting or engineering services; (2.7) Premiums on Bonds issued by Surety on behalf of the Principal; (2.8) Monies advanced under this Agreement.

(*Id.* §2).

2

On or about August 22, 2006, the plaintiff issued Payment and Performance Bond 1000751061 ("the Bond") naming defendant Carolina Realty as principal and Dick Corporation as the obligee, generally securing Carolina Realty's performance for the roofing subcontract work on a project known as NAS Pensacola, Aviation Rescue Swimmers School and Physical Fitness Center (the "Project") under a construction contract entered into between Carolina Realty and Dick Corporation, the general contractor (Lanak aff. ¶ 9, ex. B).

In 2008, the plaintiff received notice of a performance bond claim from Dick Corporation. The plaintiff, pursuant to the terms of the performance bond, tendered a completion contractor, M&M Roofing, to Dick Corporation along with funds in the amount of $118,500.00, which was the estimate American Contractors had obtained for completion of Carolina Realty's scope of work. Dick Corporation refused to accept that sum as settlement of its performance bond claim and filed suit against American Contractors and Carolina Realty as third-party defendants in *United States of America for the use and benefit of Bradco Supply Corp, v. Continental Insurance Company, et. al*, and *Infinity Builders of the Emerald Coast, LLC v. Continental Insurance Company, et. al*, Consolidated Civil Action No. 3:08-cv-56-MCR-MD. Defendant Carolina Realty filed counterclaims against Dick Corporation and asserted affirmative defenses, including fraud in the inducement (referred to as "Carolina Claims" in the settlement agreement), and plaintiff American Contractors asserted affirmative defenses, including constructive fraud and fraud in the inducement (referred to as "ACIC Claims" in the settlement agreement). After protracted litigation, the parties (Dick Corporation, Continental Insurance Company, Continental Casualty Company, Carolina Realty, and American Contractors) entered a settlement agreement resolving "all issues remaining between the parties regarding the Federal Action, Bradco Action, Infinity Action, Dick Claims, Carolina Work, Carolina Claims ACIC Claims, and all other matters between the Parties relating to or arising out of the

3

Project" (def. m. to enforce settlement, ex. A, settlement agreement). American Contractors agreed to pay Dick Corporation an additional $143,750.00, for a total of $262,250.00, "[i]n full and final settlement of all claims, demands, disputes or causes of action . . . and all other matters between the Parties relating to the Project" (settlement agreement ¶ 2; Lanak aff. ¶15).

The plaintiff received claims from various suppliers and subcontractors to Carolina Realty on the Project claiming they had not been paid. Of the claims received, the plaintiff determined the following payment bond claims were valid and paid those claimants a total of $256,497.72 to discharge those five claims:

    (1) Gulf Eagle Supply, amount paid $155,375.80

    (2) Eller and Sons Construction, amount paid $15,900.00

    (3) Building Supply Center, Inc., amount paid $6,500.00

    (4) NES Equipment, amount paid $15,280.00

    (5) United Rentals, amount paid $63,441.92

(Lanak aff. ¶ 12).

On May 12, 2009, the plaintiff, acting by and through its attorney, sent a demand letter to all defendants advising that the terms of the indemnity agreement had been invoked by claims made and demanding that they indemnify and/or post collateral security as required by the indemnity agreement (*id.* ¶ 13, ex. D). After the Indemnitors refused to do so, the plaintiff filed this action on August 13, 2009, seeking to require the defendants to indemnify, exonerate, and hold the plaintiff harmless.

American Contractors contends that it has paid costs, expenses, consulting fees and reasonable attorney's fees in the amount of $677,473.59, in connection with the claims and demands against the Bond, in defending the lawsuit brought by Dick Corporation, and pursuing this action for indemnification (*id.* ¶ 17). Plaintiff's attorney Cheryl Kniffen submitted an affidavit stating that the plaintiff has been billed and has paid

$554,653.50 in attorney's fees, costs, and expenses, which include court costs, service of process fees, deposition expenses, mileage, parking expenses, postage fees, filing fees, copy fees, facsmile transmission fees, and courier and express package delivery fees (pl. m.s.j., ex. 12, Kniffen aff. ¶¶ 10-11). Ms. Kniffen attached to her affidavit a ledger listing the attorney fees and costs billed by her firm (*id.*).

The plaintiff has recovered $323,000.00 of its losses from other indemnitors and from project salvage (Lanka aff. ¶ 18).

## **APPLICABLE LAW AND ANALYSIS**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient

to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.

***Defendants' Motion to Enforce Settlement Agreement or, Alternatively, for Summary Judgment***

The settlement agreement provides that upon plaintiff American Contractors' payment of $143,750 to Dick Corporation, all of the parties "fully and forever settle, release and discharge, each other, each of their predecessors, successors, assigns, agents, insurers, sureties, attorneys, officers, directors and employees from any and all past and present claims, demands, damages, debts, or causes of action, in law or in equity, damages and losses of any all kind or nature, whether contingent or fixed, known and unknown claims for known and unknown damages…." relating "to the Federal Action, Bradco Action, Infinity Action, Dick Claims, Carolina Work, Carolina Claims, ACIC claims, and all other matters between the Parties relating to the Project" (settlement agreement ¶ 4). The agreement provides that "the releases contained herein are strictly limited to … [the Federal lawsuits, claims, and defenses and] all other matters between the Parties relating to or arising out of the Project" (*id.* ¶ 5).The sole exclusion in this release states the "Settlement Agreement does not release Carolina or its insurers….regarding any insurance coverage or claims for indemnity relating to any personal injuries or property damage caused" (*id.* ¶ 4). The defendants argue that the instant case is "clearly covered" by the settlement agreement "because it relates to and arises out of the Project," and thus the

6

court should enforce the settlement agreement and dismiss the case (def. m. to enforce settlement at 3).

The plaintiff argues in response that its claims in this action arise out of the indemnity agreement, not the Project, and thus the claims were not released in the settlement agreement. The plaintiff argues:

> Indemnity claims are never project specific, as it is quite common for sureties to issue multiple bonds for multiple projects for the benefit of the same principal. On the other hand, there are multiple construction contracts and/or subcontracts executed by the parties that perform labor or provide materials and supplies on any given project. Typically, the parties named as principal and obligor in a bond, which in this case is Carolina Realty and Dick Corporation, enter into a construction contract for the project for which a bond is required. The contracts executed by and between general contractors, subcontractors, suppliers, materialmen, etc. for a particular project are project contracts, the breach of which results in claims that "arise out of the Project." The claims stemming from alleged breaches of construction contracts executed for particular projects must be distinguished from the obligations under an indemnity agreement, which arise when any claim against a particular principal, on any bond, arising out of any project, is made. Clearly, indemnity claims are distinguishable from project specific claims such as breach of the construction contracts claims, construction defect claims, project delay claims, etc.

(Pl. resp. m. to enforce settlement at 5-6). The plaintiff further argues that the settlement agreement was not intended to resolve the indemnity claims asserted in this action, noting that the instant action was pending at the time the settlement agreement was executed, and thus the parties would have defined the claims pending in this action had they intended to

7

include those claims in the settlement agreement, just as they defined all other claims they wished to settle.

This court agrees with the plaintiff's position that the claims in this action arise out of the indemnity agreement and not "the Project." The settlement agreement specifically states that the agreement and the releases contained therein are "*strictly limited*" to "matters between the Parties *relating to or arising out of the Project*" (settlement agreement ¶ 5) (emphasis added). As argued by the plaintiff, although the Bond and the indemnity agreement are "related" in that liability under the indemnity agreement arises when claims are made on the Bond and the surety incurs the expenses of investigating and defending or resolving the claim, it does not follow, as defendants contend, that the indemnity agreement and Bond are one and the same and the settlement of Bond claims can constitute a release of indemnity claims. Accordingly, the undersigned recommends that the defendants' motion to enforce settlement or, in the alternative, for summary judgment (doc. 131) be denied.

***Plaintiff's Motion for Summary Judgment***

The plaintiff argues that summary judgment is appropriate because the undisputed evidence shows that a proper demand was made on the defendants for indemnification, but the defendants have failed and refused to comply with their obligations under the indemnity agreement.

The defendants[2] argue that the plaintiff has released this claim in its entirety. As discussed above with regard to the defendants' motion to enforce settlement or, alternatively, for summary judgment, this court finds that the settlement agreement did not release the claims alleged in the instant action. The defendants further point out "numerous

---

[2]*Pro se* defendant John Baehr filed a motion (doc. 163) to join the other defendants in their response in opposition to the plaintiff's motion for summary judgment, which this court granted on February 29, 2012 (doc. 180).

8

allegations of impropriety on the part of Dick Corporation involving the underlying project" (def. resp. m.s.j. at 2). The defendants argue that "numerous credible claims were asserted that Dick Corporation was not owed for any work on the underlying projects, and, in fact, that it owed monies to the subcontractors" (*id.* at 6-8). However, as argued by the plaintiff, any disputed facts arising from the underlying Project litigation were resolved by the settlement agreement in the Florida cases and are not at issue in this action to enforce the indemnification agreement. Under the terms of the indemnity agreement, American Contractors had clear authority to settle the Florida litigation and chose to do so after protracted discovery and numerous depositions revealed both the strengths and weaknesses of the claims asserted in the Florida litigation. In the settlement agreement entered into by the parties to those actions, all claims and defenses raised by the parties in the Florida litigation were released and resolved, including those concerning the general contractor's alleged wrongdoing.

The defendants further argue that genuine issues of material fact exist as to whether the indemnity agreement is an unenforceable contract of adhesion and is unconscionable. The defendants argue that the agreement is an adhesion contract because it is "on a standard form, presented on a take-it-or-leave-it basis," and the party opposing the contract "did not contribute to the drafting of the contract or possess the bargaining power to negotiate the terms of the contract." *Herron v. Century BMW*, 693 S.E.2d 394, 396 (S.C. 2010) (citing *Lackey v. Green Tree Fin. Corp.*, 498 S.E.2d 898, 901 (S.C. Ct. App. 1998)), *vacated by Sonic Automotive, Inc. v. Watts*, 131 S.Ct. 2872 (2011). However, American Contractors' indemnity agreement (the same one the defendants signed) was recently declared not to be an adhesion contract in *United States for the use and benefit of Consolidated Electrical Distributors, Inc. v. Mt. Grant Electric*, No. 306CV-00309-BES-RAM, 2009 WL 347463 (D. Nev. 2009). In that decision, the defendants argued that they were offered a standardized form indemnity agreement for

9

signature and that they felt pressured to sign it. However, the district court found that the defendants did not present any evidence that they did not have an opportunity to bargain with American Contractors about the terms of the agreement or that they were required to enter into the agreement on a take it or leave it basis, and the court granted American Contractors' motion for summary judgment.

Here, the plaintiff has presented the court with evidence that the defendants had ample opportunity to negotiate the terms of the indemnity agreement and did not make any such attempt. Defendant John Paul Baehr, the President of defendant Carolina Realty, testified that he had the agreement for about five days or a week. He testified that he did not like signing the agreement in his personal capacity. However, his father (defendant John Baehr) assured him that any issues would be handled by Steve Bozeman, the contract administrator. He did not check with Steve Bozeman to confirm this prior to signing, and he did not contact an attorney about the agreement before signing. He testified that he was not given the option by his father to get his name off of the agreement. He also did not contact American Contractors prior to signing. He understood that when he signed the agreement, "it was putting us all on the hook, everybody. Everybody that signed was going to be responsible. I was assured that the name Steve Bozeman on there was - was who would be handling it if anything . . . went astray with the job." The assurances came from his father. His father told him that he could not get the roofing job without the signatures on the indemnity agreement and that there was not time to deal with American Contractors to get their names off of it. He testified that he signed the indemnity agreement under duress caused by his father. Both he and his brother, defendant William Lamar Baehr, provided their father with financial statements in support of their father's application for the bonds (pl. reply to resp. to m.s.j., ex. 2, John Paul Baehr dep. 61-64, 70, 72, 77-78, 87).

10

Defendant William Lamar Baehr testified that he understood the basic nature of an indemnity agreement. His father, defendant John Baehr, told him that he needed the family to sign the agreement in order for him to get a roofing job and that there "would be no problem involved with it that he could foresee." He further testified that he remembered only looking over the agreement briefly, and he "kind of went on his [father's] trust, trust in your family members." He recalled giving a personal financial statement to his father because he asked for it, and he thinks that he understood at the time that his father was going to use the financial statement in support of the Bond application (pl. reply to resp. to m.s.j., ex. 3, William Lamar Baehr dep. 31-32, 42).

Defendant Kimberly Baehr testified that her husband, defendant John Paul Baehr, told her to sign the indemnity agreement, but she did not know what she was getting herself into. She did not pay much attention to the agreement because she was busy working at the store, so she just signed it (pl. reply to resp. to m.s.j., ex. 4, Kimberly Baehr dep. 34, 41). Also, defendant Meredith Lee Baehr (identified in the caption of this case as "Duffy Baehr") testified that she had the opportunity to read the indemnity agreement before signing it, but she did not do so. She did not consult with an attorney or do anything to investigate what the agreement was about because she did not feel comfortable questioning her husband, defendant William Lamar Baehr (*id.*, ex. 5, Meredith Lee Baehr dep. 52-57).

Frank Lanak, the Senior Vice President of Bond Claims for plaintiff American Contractors, testified in his deposition that he had negotiated the terms of an indemnity agreement between 25 and 50 times, and he suspected that other people in the company had done so on other occasions. He testified that the underwriting file did not reflect that there was any request by the defendants to alter any terms of the indemnity agreement. When asked for examples of terms that he had seen altered in other indemnity agreements, Mr. Lanak could remember an occasion when American Contractors agreed to exclude as

11

a potential recovery source the personal family residence of an indemnitor, an instance or two where the company negotiated excluding some other specific assets, and another occasion when a contractor requested and received a modification of the terms of the agreement so that the contractor would not be put into technical default under its lending agreement with its lender (pl. reply to resp. to m.s.j., ex. 1, Frank Lanak dep. 60-63).

While the defendants contend that they "possessed no bargaining power to negotiate any meaningful terms of the agreement" (def. resp. m.s.j. at 5), the evidence shows that they made no attempt to negotiate the terms. Furthermore, the testimony show that the plaintiff did not exert pressure on the defendants to sign the indemnity agreement; rather, it was relatives who exerted pressure on the defendants to sign. None of the defendants attempted to contact the plaintiff to request changes to the agreement, even though at least John Paul Baehr and William Lamar Baehr had the agreement for about a week before they signed it. Furthermore, both men testified that they submitted personal financial statements, indicating that they knew, or reasonably should have known, that the plaintiff was relying on their credit to support the Bond application. Based upon the foregoing, this court finds that the indemnity agreement here is not an adhesion contract.

Furthermore, "[th]e fact that a contract is one of adhesion does not make it unconscionable. . . . Determining whether a contract is one of adhesion is merely the beginning point in the analysis. Unconscionability, on the other hand, requires a greater showing. Unconscionability is characterized by the 'absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms which are so oppressive that no reasonable person would make them and no fair and honest person would accept them.'" *Lackey*, 498 S.E.2d at 902 (quoting *Fanning v. Fritz's Pontiac-Cadillac-Buick Inc.*, 472 S.E.2d 242, 245 (S.C. 1996)). "Unconscionable" has been defined by the South Carolina courts as an "absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms which are so oppressive that no

reasonable person would make them and no fair and honest person would accept them." *Fanning*, 472 S.E.2d at 245 (citing *Jones Leasing v. Gene Phillips and Assocs.*, 318 S.E.2d 31 (S.C. Ct. App.1984)).

Here, even assuming for purposes of this motion that the indemnity agreement is an adhesion contract, the defendants have not shown and cannot show that the indemnity agreement is unconscionable. As argued by the plaintiff, the defendants had a meaningful choice of whether to sign the indemnity agreement offered by American Contractors. There are multiple commercial sureties that offer bonds for construction projects, and the defendants could have chosen to seek bonding from another surety if they found American Contractor's terms in the indemnity agreement were too stringent. Also, the defendants could have chosen to negotiate with American Contractors to limit the extent of their personal liability, but they did not try to do so. The defendants' conduct in executing the indemnity agreement can be summed up as signing a legal document as part of an application for bonding submitted by Carolina Realty to American Contractors that the defendants either did not read or read but signed anyway because of pressure from family members and/or assurances from family members that proved to be false. "A person who signs a contract or other written document cannot avoid the effect of the document by claiming he did not read it." *Regions Bank v. Schmauch*, 582 S.E.2d 432, 440 (S.C. Ct. App. 2003) (citing *Sims v. Tyler*, 281 S.E.2d 229, 230 (S.C. 1981)). "A person signing a document is responsible for reading the document and making sure of its contents. Every contracting party owes a duty to the other party to the contract and to the public to learn the contents of a document before he signs it." *Id.* (citations omitted). American Contractors then relied upon the agreement to issue the Bond naming Carolina Realty as principal. The defendants simply cannot show that the indemnity agreement is unconscionable under the facts of this case.

13

***Affidavits***

The defendants argue in their response in opposition to the plaintiff's motion for summary judgment that the affidavits of Frank Lanak and Cheryl Kniffen should not be considered. As discussed above, the plaintiff submitted the affidavit of Mr. Lanak, Senior Vice President of Bond Claims for the plaintiff, in support of the motion for summary judgment (*see* pl. m.s.j., ex. 1, Lanak aff.). The defendants argue that he "possesses no personal knowledge regarding the execution of the Indemnity Agreement and the self-serving, conclusory affidavit submitted with ACIC's Motion for Summary Judgment seeks to bolster its motion, often in contravention of Lanak's deposition testimony" (def. resp. m.s.j. at 8). Specifically, the defendants note that Mr. Lanak asserts in paragraph 15 of his affidavit that the settlement agreement from the Florida litigation was between American Contractors and Dick Corporation, when, in fact, as demonstrated by Mr. Lanak's deposition testimony and the settlement agreement, the Florida settlement agreement specifically included Carolina Realty and also involved the release of its agents, officers, and others (*id.* at 8-9). The plaintiff counters that Mr. Lanak's affidavit was not submitted to establish the facts surrounding the defendants signing the indemnity agreement, but rather to establish: (1) American Contractors received an indemnity agreement executed by multiple indemnitors, that included the defendants, as part of an application for bonding submitted on behalf of Carolina Realty; (2) in reliance on that agreement, American Contractors issued payment and performance bonds 1000751061, naming Carolina Realty as principal; (3) American Contractors received both performance and payment bond claims on the bonds issued for Carolina Realty and certain of those claims resulted in litigation in Florida; (4) American Contractors investigated the claims and defended itself and Carolina Realty in the Florida litigation; (5) American Contractors either paid in full or settled all the claims made on the bonds and in the Florida litigation stemming from those bonds; and (6) American Contractors has experienced a net loss on those bonds in the

amount of $873,221.31. As argued by the plaintiff, all of the facts that American Contractors seeks to prove through Mr. Lanak's affidavit are within his personal knowledge as the Senior Vice-President for Bond Claims for American Contractors. Accordingly, the defendants' request to exclude the affidavit should be denied.

The defendants further argue that the court should not consider the affidavit of Cheryl Kniffen, attorney for the plaintiff, which was also submitted in support of the motion for summary judgment (*see* pl. m.s.j., ex. 12, Kniffen aff.). In her affidavit, Ms. Kniffen sets forth the history of the relationship between her firm and client American Contractors with regard to this matter along with the total amount of attorney's fees, costs, and expenses incurred and paid by American Contractors of $554,653.50. The defendants argue that Ms. Kniffen's affidavit should not be considered as she was not identified as a witness by the plaintiff, and the defendants were unaware that she was planning to offer evidence in this matter. The defendants request that her affidavit be excluded or, alternatively, that they be permitted to depose her concerning the claimed attorney's fees and costs. The plaintiff counters that, as an officer of the court and attorney practicing more than 25 years and concentrating in commercial litigation stemming from construction contracts and suretyship for eight years, Ms. Kniffen has personal knowledge of the rates charged by attorneys of similar experience in similar cases and her affidavit should therefore be considered by the court in determining the reasonableness of attorney's fees sought by the plaintiff. This court agrees with the plaintiff that Ms. Kniffen's affidavit and supporting documentation should properly be considered by the court in determining attorney's fees.

***Calculation of Losses***

The plaintiff argues that it is entitled to judgment in the amount of $873,221.31 in claims paid, attorney's fees, costs, and expenses. This amount includes the amount paid on payment bond claims ($256,497.72), the amount paid to Dick Corporation on its

15

performance bond claim ($262,250.00), and the plaintiff's claimed attorney's fees, costs, and expenses ($677,473.59), less the amount recovered by the plaintiff from other indemnitors and from project salvage (-$323,000.00).

The plaintiff has presented evidence of its payment of the performance and payment bond claims totaling $518,747.72, and the defendants have not presented evidence to contest the accuracy of the reimbursement the plaintiff seeks. Accordingly, the plaintiff is entitled to judgment as a matter of law in that amount.

As discussed above, Ms. Kniffen submitted an affidavit and supporting documentation stating that the total amount of attorney's fees, costs, and expenses billed by her firm to the plaintiff totals $554,653.50 (Kniffen aff. ¶ 10, ex. A). It is unclear what additional fees, costs, and expenses[3] are included in the $677,473.59 attested to by Mr. Lanak in his affidavit (*see* Lanak aff. ¶ 17). Additionally, as noted above, the defendants have requested an opportunity to depose Ms. Kniffen on the claimed attorney's fees and costs (def. resp. m.s.j. at 8). Therefore, while this court finds that the plaintiff is entitled to recover attorney's fees, costs, and expenses under the indemnity agreement, the evidence before the court is insufficient to recommend entering judgment as a matter of law in favor of the plaintiff for the specific amount of those attorney's fees, costs, and expenses at this time.

***Plaintiff's Motion to Designate Expert Witness***

The plaintiff has filed a motion to designate an expert witness on the reasonableness of attorney's fees, and the defendants oppose the motion. The initial scheduling order was filed in this case on January 8, 2010. In that order, the court set April

---

[3]The difference between the amount of attorney's fees, costs, and expenses testified to by Ms. Kniffen ($554,653.50) and Mr. Lanak ($677,473.59) is $122,820.09 (*see* Kniffen aff. ¶ 10; Lanak aff. ¶ 17).

16

20, 2010[4], as the date that the plaintiff would designate expert witnesses and provide any expert's written report in compliance with Federal Rule of Civil Procedure 26(a)(2)(B). The defendants' expert witness deadline was May 20, 2010 (*see* doc. 30). The plaintiff states in its motion that the deadline for designation of experts and reports was amended on several occasions until the action was stayed upon the parties' request on December 23, 2010 (pl. m. to designate expert witness at 2-3). The plaintiff contends that after the stay was lifted on April 8, 2011, the amended scheduling orders were silent as to the date by which expert witnesses were to be designated, and therefore plaintiff's counsel "lost track of when expert witnesses should be designated in this case" (*id.* at 3). A review of the docket, however, shows that the expert witness deadline was *never* amended following the initial scheduling order filed on January 8, 2010, which set the plaintiff's deadline as April 20, 2010. Neither the first amended scheduling order, which was filed on May 24, 2010, nor any of the following amended scheduling orders contain amended dates for the designation of expert witnesses and expert witness reports.[5] Importantly, the first amended scheduling order was requested by the plaintiff for the sole purpose of extending the deadline for the parties to file their record custodian affidavits, which was the next deadline following the parties' expert witness deadlines (*see* doc. 46). As the first amended

---

[4]The plaintiff mistakenly states in its motion that the court "set May 20, 2010, as the date that the parties would designate expert witnesses and provide any expert's written report" (pl. m. to designate expert witness at 2). May 20th was the defendants' deadline, while the plaintiff's deadline was 30 days earlier on April 20, 2010 (*see* doc. 30).

[5]The plaintiff states in its motion that the initial scheduling order was first amended on May 24, 2010, and the date set for designation of experts was changed to October 18, 2010 (pl. m. to designate expert witness at 2). However, a review of the scheduling order shows that October 18th was the deadline for the parties' Rule 26(a)(3) pretrial disclosures (*see* doc. 48). The plaintiff further states that a second amended scheduling order was filed on June 4, 2010, which designated January 18, 2011, as the date by which experts should be designated. Again, the plaintiff is mistaken. The January 18th date was the deadline for the parties' Rule 26(a)(3) pretrial disclosures (*see* doc. 54). Lastly, the plaintiff contends that the third amended scheduling order, filed on October 5, 2010, amended the deadline for expert designations to March 3, 2011. Again, the March 3rd deadline was for Rule 26(a)(3) disclosures, not expert disclosures (*see* doc. 64). Likewise, the fourth and fifth amended scheduling orders did not contain deadlines for expert disclosures (*see* docs. 67, 114).

17

scheduling order was filed *after* the parties' deadlines for designation of experts and expert reports had passed and since neither party requested an extension of those deadlines, it was appropriately not included in the first amended scheduling order and the amended scheduling orders issued thereafter.

The plaintiff characterizes its motion as "seeking to correct an omission in a manner that will not prejudice the defendants or delay the trial of this case" (pl. reply to resp. to m. to designate expert witness at 2). The plaintiff argues:

> As the final scheduling orders were silent as to the date by which expert witnesses were to be designated (and the last date for designation of expert witnesses in a scheduling order in this case expired while this case was stayed), presumptively, the time for designating an expert witness is governed by Fed. R. Civ. P. 26(a)(2)(D), which states such witnesses should be identified at least 90 days before the case is set for trial, making the date 90 days prior to February 7, 2012, which is November 9, 2011. While counsel for Plaintiff placed all dates included in the amended scheduling orders in this case on her calendar, because the date for identifying expert witnesses was not mentioned in the last two amended scheduling orders entered in this case, counsel for Plaintiff lost track of when expert witnesses should be designated in this case and moves this Court to allow American Contractors to supplement its discovery responses and designate an expert witness on the reasonableness of attorney's fees out of time.

(Pl. m. to designate expert witness at 3).

The plaintiff's argument that Federal Rule of Civil Procedure 26(a)(2)(D) applies is meritless. As discussed above, the initial scheduling order provided deadlines for the parties to designate expert witnesses. As the parties never requested an extension of those deadlines and as the amended scheduling orders were all issued after those deadlines passed, the amended scheduling orders were appropriately "silent" on the matter.

18

Accordingly, the plaintiff must show good cause for the amendment of the original scheduling order. Rule 16(b) provides, in pertinent part, "A schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Normally, "[g]ood cause under Rule 16(b) exists when evidence supporting the proposed amendment would not have been discovered in the exercise of reasonable diligence until after the amendment deadline had passed." *Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*, 218 F.R.D. 455, 460 (M.D.N.C. 2003) (citation omitted).

Here, 20 months passed between the plaintiff's deadline for designating expert witnesses and the filing of its motion to designate an expert witness out of time. The plaintiff's sole justification is inadvertence. As stated by the court in *Dilmar Oil Co., Inc. v. Federated Mut. Ins. Co.*, "[c]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." 986 F. Supp. 959, 980 (D.S.C. 1997) (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)). As the plaintiff has failed to show good cause for modification of the scheduling order, the motion to designate an expert witness on the reasonableness of attorney's fees should be denied.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the defendants' motion to enforce settlement agreement or, alternatively, for summary judgment (doc. 131) be denied and the plaintiff's motion for summary judgment (doc. 135) be granted in part as set forth above. The evidence before the court is insufficient to recommend entering judgment as a matter of law in the matter of the plaintiff's attorney's fees, costs, and expenses at this time. This court further recommends that the plaintiff's motion to designate an expert witness on the reasonableness of attorney's fees (doc. 165) be denied as good cause for modification of the scheduling order has not been shown.

IT IS SO RECOMMENDED.

March 12, 2012　　　　　　　　　　　　　　　s/ Kevin F. McDonald
Greenville, SC　　　　　　　　　　　　　　　United States Magistrate Judge